# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 50588

| | | |
|---|---|---|
| CRYSTAL LORENE LIMARY, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | Boise, September 2024 Term |
| | ) | |
| v. | ) | Opinion Filed: March 28, 2025 |
| | ) | |
| SHAUN PATRICK MCLEAN, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Respondent. | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge; Fafa Alidjani, Magistrate Judge.

The district court's decision is <u>affirmed</u>. Case is to be reassigned upon remand to the magistrate court.

Kershisnik Law, PLLC, Boise, for Appellant, Crystal Lorene Limary. Patrick C. Kershisnik argued.

Murray Ziel & Johnston, PLLC, Meridian, for Respondent, Shaun Patrick McLean. Matthew C. Williams argued.

———————————

BRODY, Justice.

This appeal addresses the propriety of the magistrate court's extensive questioning of the parties and witnesses during a divorce trial pursuant to Idaho Rules of Family Law Procedure 706(g). Following a court trial, Shaun Patrick McLean appealed the magistrate court's amended judgment and decree of divorce regarding property division and custody of the parties' minor child. On intermediate appeal, the district court concluded that the magistrate court inappropriately interjected itself into the trial and that its active participation obscured the reliability of its decision. Therefore, the district court vacated the judgment and remanded the matter with instructions that the case be reassigned to a different judge. Crystal Lorene Limary appeals from the district court's decision. For the reasons explained below, we affirm the district court's decision. The case is to be reassigned to a different magistrate judge upon remand.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Crystal and Shaun married in April 2015. They both had children from previous marriages and had one child together. In 2016, Crystal, Shaun, and their six children moved into a house that Shaun's parents, Robert (Bob) and Jill McLean, purchased for them. The parties made monthly payments to Bob and Jill for the house until 2019 when Shaun took out a mortgage from a third-party to purchase the house. The purchase was made possible by a $70,000 gift of equity from Bob and Jill, which Shaun essentially used as a down payment. After the purchase, Shaun and Crystal continued to struggle with issues related to finances and raising a large, blended family, which ultimately led to Crystal filing for divorce.

The magistrate court held a four-day trial in August and September 2021. The parties stipulated to a divorce based on irreconcilable differences but still disagreed on several issues, including the classification (community property versus separate property) of the house Shaun purchased from his parents, the classification of the $70,000 gift of equity used to purchase the home which Shaun claimed was an "early inheritance," the classification of a camper trailer, and the parenting schedule for their six-year-old daughter.

The trial got off to a rocky start. Rather than starting the proceeding, the parties spent nearly the entire first day negotiating and narrowing the scope of the issues to be presented. When the proceeding was finally convened, discussions of the stipulations reached by the parties, the sorting out of exhibits, and the scheduling of additional trial days went on for an extended period. The magistrate court ultimately had to adjourn the proceeding when it became apparent that the parties were not prepared to try the case that day.

The second day of trial was also marked by some frustration. Presumably because Crystal was the petitioner, she presented her case first even though it was Shaun's burden to demonstrate that the house and the $70,000 gift from his parents were his sole and separate property. *See Erickson v. Erickson*, 171 Idaho 352, 364, 521 P.3d 1089, 1101 (2022) ("Because all property acquired during marriage is presumed to be community property, a party wishing to show that assets acquired during marriage are separate property bears the burden of proving with reasonable certainty and particularity that the property is separate." (citation omitted)).

Crystal was the second witness who was called to testify, right after Shaun. The direct and cross examinations of the parties did little to address the classification of the house or the downpayment. When the parties concluded their examinations of Crystal, rather than waiting to

2

see how the parties' cases developed or advising counsel that the court lacked clarity, the magistrate court proceeded to question Crystal at length concerning the basis for Crystal's contention that the house and downpayment were community property.

The magistrate court's questioning did not end with Crystal. The magistrate court also actively questioned Shaun; Crystal's brother, Jerry Loop; and Shaun's father, Bob. In fact, the magistrate court's questioning of witnesses took up 87 pages of an 843-page transcript.

Following trial, the magistrate court required the parties to submit written closing statements. The magistrate court subsequently entered findings of fact and conclusions of law determining that the house and camper trailer were community property and that the $70,000 was a gift to both Crystal and Shaun to purchase the home.

Shaun appealed the magistrate court's findings of fact and conclusions of law to the district court. Shaun contended the magistrate court erred by, among other things, determining (1) the house was community property, and (2) Bob's and Jill's early inheritance gift was a gift to the community. To support his second issue on appeal concerning the classification of his parents' early inheritance gift, Shaun argued that the magistrate court's conduct at trial went "well outside of the role of a judge sitting as a neutral arbiter, and [the magistrate court] became an advocate for a position, asking questions to try and prove the position [the magistrate court] ultimately decided on the case."

The parties waived oral argument on Shaun's intermediate appeal, and the district court subsequently issued a written opinion. In its opinion, the district court did not address the merits of the magistrate court's decision. Instead, acknowledging that Shaun had raised an argument "that the trial judge inappropriately conducted interrogation of the parties," it focused on whether the trial court acted within the outer boundaries of its discretion in the conduct of the trial. The district court first addressed the magistrate court's extensive examination of Crystal:

> Direct examination of [Crystal] set forth her understanding of the process and interest of the parties, presenting her basis for the claim of a community interest. The direct examination consumes approximately forty-three pages of the transcript, much of which did not concern the basis for the claim of a community interest. The cross-examination takes up a little less than seventy-pages, the great majority on other issues. Redirect amounts to nine pages. However, questioning by the trial court extended for about fifty-eight pages. A substantial portion of the questions by the trial court led [Crystal] through the nature of her claimed community interest and the basis for that claim extending back to the initial occupancy by the [parties].

3

Then, the district court quoted excerpts of Crystal's questioning by the magistrate court. It observed that "[t]he trial court's questioning did not simply clarify a record or possible misunderstanding. It led [Crystal] through an extended explanation of her position. There was also questioning of [Shaun] by the trial court on different issues from the questioning of [Crystal]."

The district court acknowledged that there may be more latitude for a trial judge's participation in a court trial versus a jury trial; nevertheless, it concluded that it could not give the findings of fact and conclusions of law the deference or consideration typically required on appeal because the active participation of the magistrate judge obscured the reliability of its decision. It vacated the magistrate court's amended judgment and decree of divorce and concluded that "[a] remand to a different judge is the appropriate result." Crystal timely appealed to this Court.

## II. STANDARDS OF REVIEW

When this Court reviews a district court's decision sitting in its capacity as an appellate court, it is procedurally bound to affirm or reverse the decisions of the district court:

> The Supreme Court reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings. If those findings are so supported and the conclusions follow therefrom and if the district court affirmed the magistrate's decision, we affirm the district court's decision as a matter of procedure.

*Bailey v. Bailey*, 153 Idaho 526, 529, 284 P.3d 970, 973 (2012) (quoting *Losser v. Bradstreet*, 145 Idaho 670, 672, 183 P.3d 758, 760 (2008)). "Accordingly, we will review the district court's decision to determine whether it correctly addressed the issues raised on appeal." *Papin v. Papin*, 166 Idaho 9, 18, 454 P.3d 1092, 1101 (2019).

## III. ANALYSIS

**A. The district court did not err when it vacated the judgment based on the magistrate court's extensive questioning of the parties and other witnesses.**

The district court vacated the judgment at issue because the magistrate court improperly interjected itself into the trial by extensively questioning the parties and other witnesses. Citing Rule 706(g) of the Idaho Rules of Family Law Procedure, Crystal argues that Shaun waived the right to challenge the magistrate court's examination of the parties and witnesses by failing to object during trial or in his written closing argument or in post-trial motions, which she contends were his "next available opportunity" to object. Shaun concedes that he did not object at trial but counters that there was no basis to object to individual witnesses being questioned. Rather, he

4

contends that it was the magistrate court's conduct as a whole that resulted in an abuse of the discretion granted by Rule 706(g).

The district court recognized that "[t]here was no objection by counsel as [the questioning] took place which raises the question of waiver." The district court summarily addressed this concern, stating, "[t]o what degree is an attorney required to confront an overreaching judge? It would take a bold attorney." The district court then concluded "[t]he customary standard of review does not work well when the primary presentation of evidence is the product of the trial court leading a party through the presentation." We agree with the district court's sentiments, but to address the waiver issue, we need to first examine the language of Rule 706.

Rule 706 governs how testimony is to be taken in divorce proceedings:

(f) Calling by Court. When the court is the trier of fact, the court may call witnesses on its own motion or at the suggestion of a party. All parties are entitled to cross-examine witnesses called.

(g) Interrogation by Court. The court may interrogate witnesses, whether called by itself or by a party.

(h) Objection. Objections to the interrogation of a witness by the court may be made at the time of interrogation *or at the next available opportunity*.

I.R.F.L.P. 706 (f)–(h) (emphasis added). The rule authorizes the magistrate court to "interrogate" witnesses, whether called by the court or by a party. While the rule uses the word "interrogate," we made it clear in an appeal examining a similar provision in the Idaho Rules of Evidence that a trial court does not have unbounded discretion to question witnesses and that doing so is fraught with risk:

Idaho Rule of Evidence 614(b) provides that a trial court "may examine a witness regardless of who calls the witness." I.R.E. 614(b). However, exercise of this authority is fraught with the risk that the jury will be influenced in their deliberations by their perception of the court's opinion of an issue. *See Milton v. State*, 126 Idaho 638, 642, 888 P.2d 812, 816 (Ct. App. 1995). Indeed, "[t]here is also a risk that the jury will attach undue significance to the subject matter of the court's questions, for if the court thinks the issue important enough to inquire further of the witness, why should not the jury?" *Id.* This is why the discretion to question a witness is not unbounded, and a court exercising this power must not "comment on the weight of the evidence" or express an "opinion as to the evidence . . . relat[ing] to a critical issue in the case." *See State v. White*, 97 Idaho 708, 712, 551 P.2d 1344, 1348 (1976) (citations omitted). Accordingly, a trial court's questioning of a witness is limited to "clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony." *State v. Lankford*, 116 Idaho 860, 875,

5

781 P.2d 197, 212 (1989) (quoting *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977)).

*Secol v. Fall River Med., P.L.L.C.*, 168 Idaho 339, 348, 483 P.3d 396, 405 (2021) (alterations in original). These risks are no less in a court trial setting where the judge's questioning of a witness can demonstrate bias and undermine the reliability of any findings of fact or conclusions of law that are subsequently entered.

Rule 706(g) does not specify precisely when an objection must be made, but, rather, provides that it *may* be made at the time of the questioning or at the "next available opportunity." The phrase "next available opportunity" is not defined. When we interpret a rule, we begin with the plain language of the rule itself, but we may temper that interpretation by the purpose of court rules generally:

> Today we make it clear that while the interpretation of a court rule must always begin with the plain, ordinary meaning of the rule's language it may be tempered by the rule's purpose. We will not interpret a rule in a way that would produce an absurd result. Instead, in keeping with the Idaho Criminal Rules' aim of "provid[ing] for the just determination of every criminal proceeding." I.C.R. 2(a), we construe the rules "to secure simplicity in procedure, fairness in administration and elimination of unjustifiable expense and delay." *Id.*

*State v. Montgomery*, 163 Idaho 40, 44, 408 P.3d 38, 42 (2017). Like the Idaho Criminal Rules at issue in *Montgomery*, Rule 101(d) of the Idaho Rules of Family Law Procedure provides that the rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."

In the context of a family law proceeding where the magistrate court and the trier of fact are one and the same, "the next available opportunity" to object to the magistrate court's questioning of witnesses is an opening brief on appeal. In these cases, the magistrate court's error—exceeding the boundaries of its discretion to question witnesses—is already complete at the time it engaged in improper questioning and became an active participant in the trial. In other words, if no contemporaneous objection is required, the only way to correct the error created by the magistrate court's questioning is to challenge it on appeal. Raising the objection in a written closing argument as the dissent contends should have been done or in a post-trial motion presented to the magistrate court gives no meaningful relief if, in fact, the magistrate court abused its discretion. The damage is done through the interrogation itself because it undermines the magistrate court's ability to render a fair and impartial decision. If the magistrate court abused its

6

discretion during the trial, the next available opportunity to make an objection is before an appellate court, which then determines whether the magistrate court's decision must be vacated.

This case highlights two serious issues with the way Rule 706 has been drafted. First, the use of the word "interrogate" may suggest that the magistrate court has unbounded discretion in questioning witnesses. The term is typically associated with law enforcement, implying a line of questioning conducted in a leading, aggressive manner. *See Interrogation*, Oxford Learner's Dictionary.com (last accessed Mar. 25, 2025). Second, we question the utility of the "next available opportunity" language given that the magistrate courts in family law cases are the triers of fact. Rule 706 is modeled after Rule 614 of the Idaho Rules of Evidence:

> (a) Calling. When the court is the trier of fact, it may call a witness on its own or at a party's request. Each party is entitled to cross-examine the witness.
>
> (b) Examining. The court may examine a witness regardless of who calls the witness.
>
> (c) Objections. A party may object to the court's examining a witness either at that time *or at the next opportunity when the jury is not present*.

I.R.E. 614 (emphasis added). Under Rule 614, a party may object to a trial court's examination of a witness at the time of the questioning or at the next opportunity *when the jury is not present*. Rule 614 gives attorneys flexibility in addressing objectionable questions posed by a trial court. The objection can be made either at the time it occurs, or outside the presence of the jury so that potentially damaging conduct is not unduly emphasized. We question whether the "next available opportunity" language has any utility in a family law case where no jury is involved since the damage caused by extensively questioning a witness or party is complete at the time of questioning. We therefore send Rule 706 to the Children and Families in the Court Committee to consider amendments to the rule.

In sum, we hold that Shaun did not waive his arguments on intermediate appeal regarding the magistrate court's questioning of witnesses by failing to object at trial, and the district court did not err in addressing whether the magistrate court improperly questioned the parties and witnesses.

## B. The district court did not err when it determined that the magistrate court's extensive questioning of the parties and witnesses was improper.

We now turn to the merits of the district court's decision regarding the magistrate court's conduct at trial. Crystal argues the district court erred in concluding the magistrate court's questioning of the parties and witnesses was improper because a magistrate court has authority to

7

interrogate witnesses under Rule 706 of the Idaho Rules of Family Law Procedure. She contends there was no basis for the district court to vacate the judgment because the district court did not apply the proper standard of review of the magistrate court's findings. We disagree.

The district court's decision on intermediate appeal reflects that it determined it could not conduct proper review of the magistrate court's findings of fact and conclusions of law because the magistrate court's involvement in the presentation of evidence created reliability issues:

> [T]his [c]ourt cannot give the findings of the trial court the weight that must normally be applied. Whether the end was fair, the active participation of the judge in the presentation of [Crystal]'s case obscures the reliability of the decision. On an even field the burdens of each party may be decisive in the trial court's decision and this [c]ourt's review. So much of [Crystal]'s case was repeated or elicited by the trial court's examination this [c]ourt is unable to apply typical standards of review.
>
> . . . The customary standard of review does not work well when the primary presentation of evidence is a product of the trial court leading a party through the presentation.

By concluding that the "customary standard of review [did] not work well" in this case due to the magistrate court's active participation in the presentation of evidence, the district court implicitly recognized a concern that the magistrate court expressed its views of the evidence and the weight it would be given through its questioning, rather than in its findings of fact. We share the district court's concern.

It is difficult to appreciate what transpired in this case without reading the entire transcript of the trial. We certainly appreciate some of the frustration that the magistrate court experienced. The first day of trial was largely lost in negotiations and housekeeping matters and had to be adjourned because the parties were not prepared to proceed. When Crystal was called as a witness on the second day, the direct and cross-examination focused predominantly on the parties' disputes during the marriage and did little to address the classification of the home, the downpayment, or the camper trailer, the primary issues to be decided. At that juncture, however, the magistrate court lost sight of the fact that the law presumes that property acquired during the marriage is community property. *Erickson v. Erickson*, 171 Idaho 352, 364, 521 P.3d 1089, 1101 (2022). "Because all property acquired during marriage is presumed to be community property, a party wishing to show that assets acquired during marriage are separate property bears the burden of proving with reasonable certainty and particularity that the property is separate." *Id.* (citing *Barton v. Barton*, 132 Idaho 394, 396, 973 P.2d 746, 748 (1999)).

8

Accordingly, even though Crystal was the petitioner and presented her case first, it was Shaun's burden to overcome the presumption in favor of community property and demonstrate that the house, the $70,000 gift of equity from his parents used as a downpayment on the home, and the camper trailer were his sole and separate property. Rather than waiting for Shaun's case in chief to determine whether he had met his burden to overcome the presumption, or advising counsel that it lacked clarity on the matter, the magistrate court stepped in, stating, "I have a question for you. . . . And it could be because everybody else knows the answer and so they haven't gotten into it, but I don't know the answer." The magistrate court continued, "[y]ou have testified that you have believed since 2016, when you guys moved into this house, that the house belonged to you guys as a family?" The magistrate court's questioning then proceeded to lay out Crystal's position and the factual basis for her beliefs:

| [Magistrate court:] | You believed you guys already had equity in the home -- |
|---|---|
| [Crystal:] | Yes, and that was ours. |
| [Magistrate court:] | -- from starting in 2016? |
| [Crystal:] | Yes. |
| [Magistrate court:] | And why did you believe that? |
| [Crystal:] | Because it was told to me it was ours. That was the whole reason why the home was purchased. And Shaun's credit was not the greatest, and he couldn't do it. So we had to clean up the credit. . . . |
| [Magistrate court:] | Who led you to believe the house was yours when you moved in? |
| [Crystal:] | All of us, Bob, Jill, Shaun. |
| . . . . | |
| [Magistrate court:] | And when you say "I was originally on the loan," that means you guys originally applied together as husband and wife on a loan? |
| [Crystal:] | Together, yes. |
| [Magistrate court:] | Okay. Were you then somehow notified by some entity that you two, together, did not qualify? |
| [Crystal:] | Yes. |
| [Magistrate court:] | Then was there more conversation between you and Mister -- well, your husband -- |
| [Crystal:] | Yes. |

| | |
|---|---|
| [Magistrate court:] | -- and then his parents? |
| [Crystal:] | Well, I wasn't happy about [being] taken off the loan because that didn't make any sense to me, because why would I -- but then they explained it to me that it would hurt something. I don't remember exacts, but -- |
| [Magistrate court:] | Who did? Who explained that to you? |
| [Crystal:] | Shaun. |

. . . .

| | |
|---|---|
| [Magistrate court:] | When you say "equity," you mean those monthly payments you were making? |
| [Crystal:] | So we're down to the wire of buying the home. It was before August, maybe a month before -- well, I mean, roughly. And now I'm being told we're giving roughly "X" amount of our equity to his parents, and we're taking the chunk that we're seeing in the exhibits now and as our down payment and a way to avoid taxes. I mean, this is how it was explained to me, they're going to give it. |
| [Magistrate court:] | I just want to [inaudible] lingo. |
| | When you say our "equity," do you mean those payments that you guys were making monthly? |
| | You didn't have any other payments that you made to parents during the time 2016 to 2019, or did you guys give them a chunk besides those monthly payments? |
| [Crystal:] | So they were getting -- so we were making the payments. |

. . . .

| | |
|---|---|
| [Magistrate court:] | So they buy it because you all don't qualify, you and Shaun -- |
| [Crystal:] | Correct. |
| [Magistrate court:] | -- to buy a house at this point? |
| [Crystal:] | Yes. |
| [Magistrate court:] | And you believed that they are buying it, but you guys are paying into this home via your payments every month? |

The exchange between Cystal and the magistrate court went beyond establishing the factual basis for Crystal's position regarding the home and the downpayment. It also laid the groundwork to undermine the gift affidavit signed by Shaun's parents and Bob's later testimony at trial. After asking Crystal about the $70,000 equity in the home, the magistrate court pivoted to questioning Crystal about the camper trailer that was titled in both Shaun's and Crystal's names during the

marriage. At this point in the trial, Crystal had testified that Bob bought the camper trailer from Shaun during his divorce with his prior wife, but Shaun kept it, and that Crystal and Shaun made monthly payments to buy the camper trailer from Bob during their marriage. Neither Shaun nor Bob had yet testified about the original purchase of the camper trailer or any financial arrangements they had made.

The focus of the magistrate court's questioning of Crystal regarding the camper trailer did *not* concern whether it was community or separate property. Instead, the magistrate court probed Crystal's knowledge and understanding, like a skilled advocate, to ascertain whether Shaun's parents had previously assisted Shaun in hiding assets from his ex-wife:

| | |
|---|---|
| [Magistrate court:] | All right. Can you tell me what, if anything, [Shaun's dad, Bob] told you about -- why did you think that he had moved this -- well, why did you think that he had sold or had his father, I guess, take this trailer during his divorce? |
| [Counsel for Shaun:] | Judge, I'm going to object on that question just because it's a lack of foundation. She can say what he told her, but she wasn't around when he was doing the marriage settlement on his previous marriage. |
| [Magistrate court:] | What's your objection again? |
| [Counsel for Shaun:] | He asked her what her understanding was, but she wasn't there. |
| [Magistrate court:] | Right. She already testified that she believed he had his father take the trailer to hide the trailer from his ex-wife. I'm trying to find out why she believes that. |
| [Counsel for Shaun:] | Well, she actually didn't say "hide." She said so he could keep it. I think you're inferring hide, but she didn't actually use the word "hide." She said his father took it. You asked why, and she said she he could keep it. |
| [Magistrate court:] | Well, I'll go back and listen to the words. |
| [Counsel for Shaun:] | Okay. |
| [Magistrate court:] | But I'm trying to find out why she thinks that. |
| | Why did you think that he had his father purchase or take the trailer as part of during, before -- I don't know -- the last divorce he had in order to keep it? |
| | Whatever the verbiage is, where did you draw this conclusion? |
| [Crystal:] | I drew it from what he told me. |
| [Magistrate court:] | Which is what? |

| | |
|---|---|
| [Crystal]: | He -- so this way he could obtain it back, essentially. |
| [Magistrate court:] | Well, did he ever tell you what he did, what he and his dad did, or no? |
| [Crystal:] | Yeah. He sold it to his dad so his ex-wife couldn't get it. And I just -- there was an instance to where I do know it was parked in front of the house, and he thought it was funny because he wondered what Shayla bought. Because in Shayla's mind, this trailer was gone and sold. |
| [Magistrate court:] | To -- |
| [Crystal:] | To a third party. |
| [Magistrate court:] | Some third party, not his -- not Bob? |
| [Crystal:] | Correct. |
| [Magistrate court:] | Those are all -- these things you're telling me all came from [Bob] himself? |
| [Crystal:] | Yes. |
| . . . . | |
| [Magistrate court:] | And his ex-wife is named what? |
| [Crystal:] | Shayla. |

Following the magistrate court's interrogation of Crystal, it discussed which party's counsel would first be permitted to ask Crystal any follow-up questions. The magistrate court decided *Shaun's counsel* should cross-examine Crystal first, thereby implying that its questioning was, in fact, a direct examination that elicited new testimony or additional evidence, which should then be subject to cross examination.

In addition to Crystal, the magistrate court questioned Shaun; Crystal's brother, Jerry Loop; and Bob. The magistrate court's questioning of Bob alone comprised twenty pages of the trial transcript and was replete with leading questions—particularly concerning how he and his wife purchased real property, repaid home loans, and classified the properties they have enjoyed together during their marriage.

The magistrate court's questioning of Bob about Shaun's purchase of the house as his sole property was particularly pointed:

| | |
|---|---|
| [Magistrate court:] | In your testimony, you said, "I talked to a loan broker, and she said Shaun would have to buy it on his own." |
| | Can you tell me what that means? Why does your son have to buy a house on his own? |

| | |
|---|---|
| [Bob:] | Did I say "had to buy a house"? |
| [Magistrate court:] | Your exact words were, "I talked to a loan broker, and she said Shaun would have to buy it on his own." |
| | And I'm wondering, when you were talking to the loan broker, what it is that you were telling the loan broker that led the loan broker to believe Shaun had to buy a house on his own and his own name only. |
| [Bob:] | Well, I don't think I told the loan broker anything. She told me that the house would be sold -- Shaun would be buying the house on his own, is what the loan broker told me. |
| [Magistrate court:] | So the loan broker made the decision for a married couple as to who would be buying a house? |

The magistrate court then questioned Bob regarding the $70,000 he and his wife gave as a down payment for the house and whether it was intended at that time to be a gift solely to Shaun:

| | |
|---|---|
| [Magistrate court:] | Okay. Again, your testimony was that once you were told by the lender that Shaun will be buying the house on his own or he had to buy the house on his own, then you figured you could just give him the $70,000 because you wanted that money to go to him only, anyway. |
| | And so you thought there would be some risk of the money being split between Shaun and Crystal down in the future? |
| [Bob:] | We wanted Shaun to have his inheritance to buy the house. He didn't have to buy the house. He chose to buy the house. And to help him out to do that, we gave him his inheritance early, part of it. |
| [Magistrate court:] | Mr. Williams -- Mister, excuse me, McLean, you are a married person; correct? |
| [Bob:] | Correct. |
| [Magistrate court:] | And it sounds like during your marriage, you bought a few properties with your wife? |
| [Bob:] | Yes. |
| [Magistrate court:] | And when you have bought properties, like real estate type of properties, have you only bought them in your name as a married couple so that some day [sic] they would only be -- if you were divorced, they would only be yours? |
| [Bob:] | No, we've always bought it jointly. |
| [Magistrate court:] | And what did that mean to you when you bought it jointly? |
| [Bob:] | Well, it was -- we both took the obligation for the loan to be repaid. And so that was always the way we set it up. |

As the magistrate court continued to question Bob, the questions about his understanding of the transaction became even more leading and implied that Shaun's position that the gift of equity was made solely to him was implausible:

| | |
|---|---|
| [Magistrate court:] | So you didn't have a conversation with your son about this at all as to like, "Wow, why are you buying a house when you're married and having it only in your name?" You didn't have that kind of conversation, asking him why? |
| [Bob:] | No, I never questioned him on why he bought a house in his name. I just knew that that's the way the lender was setting it up. |
| [Magistrate court:] | Well, you would agree that a lender doesn't make these decisions as to who may or may not become indebted to them? It's the buyers; correct? |
| | The lender can say "I'm not going to loan you anything." But if they're a married couple, the lender can put both their names on a loan and make them both indebted to them; right? |
| [Bob:] | I believe so. |
| . . . . | |
| [Magistrate court:] | Did you mention to her, then, not to worry about it because you guys were giving the $70,000 in equity to them in an effort to help them buy a house at a lower interest rate so -- does that make sense? Did you -- |
| [Bob:] | I don't think I ever said -- I said that you would be living in a house with equity. I don't think I ever said I was giving it to them. I told Shaun I was giving it to him, but I don't believe I said to both of them. |
| [Magistrate court:] | Well, when you said to her that she would be living in the house with equity, did she not ask you what that meant? Like where would the equity come from? |
| [Bob:] | Well, it was, you know, obviously, it had to come from us because, you know, they were just going to be able to live in a house with equity. So I don't know where she would have thought it came from if it wasn't from us. |
| [Magistrate court:] | Would you agree that it's likely everyone would have understood, if you said you'll be living in a house with equity, that it would have been from you and your wife putting -- giving back the equity, I guess I should say, giving them that money or giving -- well, I guess you said you didn't specify to whom you would be giving, but that you |

14

> would be providing a certain amount of money that would
> be then the equity in the house?

The magistrate court's interrogation of the parties and witnesses in this case was anything but neutral. The transcript reflects that the magistrate court impermissibly stepped into the role of an advocate to assist Crystal's presentation of evidence—and undermine Shaun's—regarding the classification of the property at issue. In effect, through its questioning, the magistrate court signaled how it would likely decide the property classification issues. *See State v. White*, 97 Idaho 708, 712, 551 P.2d 1344, 1348 (1976) (holding that a judge must not "comment on the weight of the evidence" or express an "opinion as to the evidence . . . relat[ing] to a critical issue in the case" (citations omitted)). The magistrate court did not limit its questions to "clarifying the evidence, controlling the orderly presentation of the evidence, confining counsel to evidentiary rulings, and preventing undue repetition of testimony." *State v. Lankford*, 116 Idaho 860, 875, 781 P.2d 197, 212 (1989) (quoting *United States v. Allsup*, 566 F.2d 68, 72 (9th Cir. 1977)). The magistrate court's conduct affected Shaun's right to a fair trial decided by a neutral arbiter and was not harmless. *See* I.R.F.L.P. 806 (harmless errors are disregarded). Accordingly, we agree with the district court that the amended judgment must be vacated and the case reassigned to a different magistrate judge on remand.

## C. Neither party is entitled to attorney fees on appeal.

Both parties request attorney fees on appeal under Idaho Code section 12-121. "In any civil action, the judge may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. "An award of attorney fees under [Idaho Code section 12-121] is not a matter of right to the prevailing party." *Pelayo v. Pelayo*, 154 Idaho 855, 865, 303 P.3d 214, 224 (2013) (quoting *Michalk v. Michalk*, 148 Idaho 224, 235, 220 P.3d 580, 591 (2009)).

Though both parties allege that the other pursued or defended the appeal frivolously, both have submitted well-founded arguments on an issue of first impression regarding Rule 706 of the Idaho Rules of Family Law Procedure. Therefore, we decline to award attorney fees to either party on appeal. Costs are awarded to Shaun as the prevailing party on appeal pursuant to Idaho Appellate Rule 40.

## IV. CONCLUSION

For the forgoing reasons, we conclude the district court did not err in concluding the magistrate court abused its discretion by extensively questioning the parties and witnesses. We

15

therefore affirm the district court's order vacating the magistrate court's amended judgment and decree of divorce and remanding for a new trial. On remand, the case shall be assigned to a different magistrate judge for further proceedings. Shaun is awarded costs on appeal.

Chief Justice BEVAN and Justice ZAHN CONCUR.


MEYER, J., dissenting.

I share the majority's concerns regarding the magistrate court's excessive questioning of Robert McLean. Despite those concerns, I must respectfully dissent because Shaun McLean failed to preserve his argument on appeal. On intermediate appeal, the district court recognized that "[t]here was no objection by counsel as [the questioning] took place which raises the question of waiver." Without citing an applicable rule, the district court summarily addressed the issue, stating, "[t]o what degree is an attorney required to confront an overreaching judge? It would take a bold attorney." I respectfully disagree. It does not require an inordinate amount of courage for an attorney to make an objection when the trial court has erred—in fact, it is their job to do so. Because I believe Idaho attorneys are made of sterner stuff than this, I lodge my dissent.

Rule 706 of the Idaho Rules of Family Law Procedure governs when an objection to a court's interrogation of a witness may be made. I.R.F.L.P. 706(h); *see* I.R.F.L.P. 101(b). The rule provides that "[o]bjections to the interrogation of a witness by the court may be made at the time of interrogation or at the next available opportunity." I.R.F.L.P. 706(h). This rule is consistent with the general principles of issue preservation where "a party preserves an issue for appeal by properly presenting the issue with argument and authority to the trial court below and noticing it for hearing[.]" *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022). A party may also preserve an issue for appeal when the trial court issues an adverse ruling. *Id.* We recently explained:

> To properly preserve and present to this [C]ourt claimed errors of this nature, timely and proper objection should be made, first so the trial court may have an opportunity to prevent or if possible eradicate such error . . ., and second, that there be adverse ruling or action by the trial court for review by this court.

*Id.* at 925, 517 P.3d at 854 (alteration in original) (quoting *Stewart v. City of Idaho Falls*, 61 Idaho 471, 478–79, 103 P.2d 697, 700 (1940)).

Although Shaun raised some objections before the magistrate court, the only formal objection he made was based on a lack of foundation. The court asked Crystal, "Can you tell me

16

what, if anything, [Shaun] told you about—why did you think that he had moved [the camper trailer]—well, why did you think that he had sold or had his father, I guess, take this trailer during his divorce?" Shaun's attorney objected, "Judge, I'm going to object on that question just because it's a lack of foundation. She can say what he told her, but she wasn't around when he was doing the marriage settlement on his previous marriage." The magistrate court did not explicitly overrule or sustain the objection but explained why it asked the question. Shaun did not raise the court's failure to rule on the objection as an issue on intermediate appeal.

Following an exchange regarding an objection by Crystal's attorney, Shaun moved to strike "a significant portion of [Crystal's] testimony . . . as to the real property that she . . . testified she gained an interest in." Notably, because the attorneys were not prepared, the parties postponed presenting some evidence and testimony until the September trial dates. At the onset of the trial in August, the parties' narratives were undeveloped and unclear. To be sure, the parties' presentations of the evidence and the framing of their issues were disorganized. In this regard, after hearing the parties' argument on Shaun's motion to strike, the magistrate court stated:

> There will be no striking of this because it's the first time, from my own questioning, that I have understood what is happening within this family.

> Because from the direct and cross when the attorneys had—and you're the ones who have all of the records, not me—this was a very confusing situation in which a party is telling me over and over again that this was their home, she always believed it was their home, and that they were building equity in the home. You refer to it as rent, and she keeps referring to it as equity.

> The context that I asked about, in order to understand why she had hesitation, she's first trying—they're trying to buy the house. They don't qualify. Then there is a hesitation that she doesn't—she says, "I did not want to sign to purchase this particular house, and then was talked into it." That discussion about the 2016 and how this purchase of this house came about was to explain sort of the background as to why . . . she believed it up until [sic] why there was a new hesitation that was created.

> Your client testified that this house was—it belonged to his parents. I took it from his earlier testimony that this house was theirs for a while, not just from 2016, and that it was held in trust, and it was a family home held in trust.

> And so this is just lending context as to how close in time the purchase of the house is and whether there is an intent, other than . . . what's on paper that we see here.

Shaun then withdrew his motion to strike. After the withdrawal, the magistrate court allowed both parties a renewed opportunity to question Crystal. Following Crystal's recross-examination by

Shaun's attorney, the magistrate court explained its extended questioning of Crystal to the attorneys outside the presence of the parties:

> [I]f I am, in the end, to make a decision about something as important as a family—potentially a community property here, I've got to understand what the context is.
>
> And that's why I asked the questions, because, honestly, from earlier testimony I could not understand why she had this belief that this is not rent, this is mortgage payments, this is equity building.

During the trial, none of Shaun's objections protested the length or breadth of the magistrate court's questioning of Crystal. Shaun did not object at any time to the magistrate court's questioning of Robert. His objections were narrowly focused on foundation and unrelated procedural matters, with no contemporaneous objection to the magistrate judge's role in questioning. He also did not raise an objection to the magistrate court's questioning of either party or witness in his written closing argument. Nor did Shaun raise the magistrate court's questioning of Crystal as an issue on intermediate appeal.

In *State v. Gamble*, a case that the district court relied on, the Court of Appeals reviewed a judge's questioning despite the defendant's failure to object at trial. 146 Idaho 331, 343, 193 P.3d 878, 890 (Ct. App. 2008). During a criminal jury trial, the district court asked a lighthearted question to a testifying law enforcement officer. *Id.* at 342–43, 193 P.3d at 899–90. Because the defendant failed to object to the judge's questioning during the trial, the Court of Appeals could only review the judge's questioning in light of Rule 614 of the Idaho Rules of Evidence for fundamental error. *Id.* at 343, 193 P.3d at 890. The Court of Appeals reasoned that the judge's brief and relatively benign comments were not so egregious as to threaten the very foundation of the case. *Id.* Nor did they show a bias in favor of the witness. *Id.*

The district court's reliance on *Gamble* was improper for several reasons. First, *Gamble* was a criminal case where the State charged the defendant with numerous serious offenses. *See id.* at 334, 193 P.3d at 881. In contrast, this case is a civil family law matter focusing on determining custody of a minor child and dividing property. Second, *Gamble* involved a jury trial. *Id.* at 335, 193 P.3d at 882. This case is a bench trial. Third, *Gamble* applied the Idaho Rules of Evidence. *Id.* at 343, 193 P.3d at 890. In this case, a unique set of rules apply—the Idaho Rules of Family Law Procedure—which allow for greater informality during the fact-finding phase of the case due to the equitable nature of divorce proceedings. The record does not reflect that either party opted to file a motion under Rule 102(b) of the Idaho Rules of Family Law Procedure, to require strict

18

compliance with the Idaho Rules of Evidence. Finally, unlike the single lighthearted question that the judge asked a witness in *Gamble*, the magistrate judge extensively questioned several witnesses in this case. *Gamble* is not comparable to this case.

Rule 706(h) of the Idaho Rules of Family Law Procedure allows some flexibility as to when an objection must be made and permits an objection at the time of interrogation or the next available opportunity. *See* I.R.F.L.P. 706(h). In this case, as the objection was not made at the trial, the next available opportunity to object was in the parties' written closing statements—not in an intermediate appellate brief to the district court. And even though Shaun argued to the district court that the magistrate court went too far in its questioning of Robert, the district court impermissibly extended that contention to analyze the magistrate court's questioning of Crystal instead. Because Shaun raised no objection below to the extensive nature of the magistrate court's questioning of witnesses, that issue was not preserved for appeal. The majority's claim that Shaun's intermediate appeal to the district court constituted the "next available opportunity" under Rule 706(h) misinterprets the rule's intent. The rule contemplates objections at the pretrial or trial procedural phases, not nine months later during appellate review under Idaho Rule of Family Law Procedure 813 and Rule 83(a)(2) of the Idaho Rules of Civil Procedure. *See* I.R.F.L.P. 813 ("Any appeal of an order, decree, or judgment is governed by Idaho Rule of Civil Procedure 83."). Rule 706 is not an error-correcting rule; instead, it provides a mechanism to prevent error and ensure a fair trial by requiring parties to object contemporaneously or at the next available opportunity.

In addition, addressing issues not raised by parties below or on appeal can run afoul of principles of party presentation. "In our adversarial system of adjudication, we follow the principle of party presentation." *Herr v. Herr*, 169 Idaho 400, 404, 496 P.3d 886, 890 (2021) (quoting *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020)). "[I]n both civil and criminal cases, in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision[.]" *Sineneng-Smith*, 590 U.S. at 375 (first alteration in original) (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). We presume "that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." *Id.* (brackets omitted) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment)).

In this case, Shaun and Crystal were both represented by counsel at trial. Nevertheless, the parties' presentation and framing of the issues at trial was disorganized and incomplete. In such

19

circumstances, the principle of party presentation is flexible because circumstances exist in which "a modest initiating role for a court is appropriate." *Id.* at 376. This flexibility is particularly salient in a divorce action, which is an action in equity. *O'Holleran v. O'Holleran*, 171 Idaho 671, 676, 525 P.3d 709, 714 (2023). That is to say, the "trial court is vested with broad discretion in determining the 'equities' between the parties." *Alesco, Inc. v. Fatty's Bar, LLC*, 166 Idaho 516, 524, 461 P.3d 798, 806 (2020) (alteration omitted) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 867, 421 P.3d 187, 198 (2018)). A trial court's application of equitable principles requires using "principles of justice to correct or supplement the law as applied to particular circumstances, including" preventing hardships that would otherwise occur from a rigid interpretation of the law. *Id.* at 526, 461 P.3d at 808 (quoting *Lunneborg*, 163 Idaho at 867, 421 P.3d at 198). Consistent with principles of equity, Rule 706 of the Idaho Rules of Family Law Procedure allows for an initiating role for courts in family law cases. *See* I.R.F.L.P. 706(f)–(g). "When the court is the trier of fact, the court may call witnesses on its own motion or at the suggestion of a party. All parties are entitled to cross-examine witnesses called." I.R.F.L.P. 706(f). In addition, "[t]he court may *interrogate* witnesses, whether called by itself or by a party." I.R.F.L.P. 706(g) (emphasis added). Thus, Rule 706 contemplates that in family law trials the court may, as a matter of discretion, call, examine, and interrogate witnesses.

With Rule 706 in mind, the district court's statement that "[i]t would take a bold attorney" to object to an overarching judge is unfounded, given the procedural safeguards built into the rule. The rule explicitly allows parties to cross-examine any witnesses called by the trial court, which acts as a check on judicial overreach. Moreover, attorneys have recourse if a court's involvement becomes excessive or unfairly prejudicial—objections to judicial questioning are not only permitted but are expressly contemplated by the rule. *See* I.R.F.L.P. 706(g). An attorney who raises such an objection is not acting "boldly" but is instead operating appropriately within the established procedural framework. I would suggest that the inverse is true; it would take a particularly meek attorney to forego objecting to a judge's overreaching questioning of witnesses. After all, attorneys are hired to speak for their clients, to make objections, to make appropriate appellate records; in short, to zealously represent their clients' interests.

Magistrate courts are given considerable latitude in family law cases with respect to the calling, questioning, and even interrogation of witnesses. This latitude can be necessary, especially in cases where one or both of the parties is self-represented. But it raises potential conflict with

20

principles of party presentation and prohibited advocacy on behalf of one or all the parties by the court. Accordingly, magistrate judges must exercise restraint in questioning parties, even in light of Rule 706. The laudatory goal of the Idaho Rules of Family Law Procedure in securing a just, speedy, and inexpensive determination, *see* I.R.F.L.P. 101(d), and the latitude afforded magistrate courts by Rule 706, cannot override the competing principles of party presentation on the one hand and judicial restraint and impartiality on the other. Unfortunately, in this case, not only did the parties' attorneys fail to advance their respective clients' interests in a cogent and thorough manner, but Shaun's counsel also failed to object to the magistrate court's unusually probing and lengthy questioning of witnesses at the time of the questioning when he perceived that it was going or had gone too far, or even at the next court setting or in his written closing arguments.

The majority's approach expands the scope of appellate review to include issues Shaun did not preserve at trial. Shaun's appeal to the district court focused narrowly on the magistrate court's questioning of Robert, but even this issue was not raised contemporaneously during the trial. By failing to object during the trial, Shaun forfeited his ability to challenge these issues on appeal, as appellate courts, too, must adhere to the principles of party presentation. *See Sineneng-Smith*, 590 U.S. at 375. On intermediate appeal before the district court, Shaun and Crystal were similarly represented by counsel. In analyzing an issue that Shaun did not properly raise—whether the magistrate court abused its discretion by extensively questioning Crystal—the district court relied on *Herr* for the party presentation principle that courts should rely on the parties to frame the issues for decision. However, the irony went unnoticed, because the district court violated this principle by considering and ruling on an issue raised for the first time on appeal.

An objection is still required to preserve the issue for appeal. *See Siercke v. Siercke*, 167 Idaho 709, 715, 476 P.3d 376, 382 (2020). "[An objection] is foundational for appellate review." *Miramontes*, 170 Idaho at 925, 517 P.3d at 854. Shaun made only one foundational objection and a scope objection that he later withdrew. As we have repeatedly made clear: "It is axiomatic that this Court will not consider issues raised for the first time on appeal. A party must raise both the issue and their position on that issue *before the trial court* for this Court to review it." *Siercke*, 167 Idaho at 715, 476 P.3d at 382 (emphasis added) (internal citation omitted). Because Shaun failed to object to the magistrate court's questioning of the parties and witnesses during the trial or at the next available opportunity, Shaun waived his argument on appeal.

I respectfully dissent.

Justice MOELLER CONCURS.